[No. G026580. Fourth Dist., Div. Three. Oct. 30, 2000.]

VEDANTA SOCIETY OF SOUTHERN CALIFORNIA, Plaintiff and Respondent, v.
CALIFORNIA QUARTET, LTD., et al., Defendants and Appellants.

NORBERTINE FATHERS OF ORANGE et al., Plaintiffs and Respondents, v.
CALIFORNIA QUARTET, LTD., et al., Defendants and Appellants.

ENDANGERED HABITATS LEAGUE, INC., et al., Plaintiffs and Respondents, v.
CALIFORNIA QUARTET, LTD., et al., Defendants and Appellants.

518

520

**COUNSEL**

Latham & Watkins and Robert K. Break for Defendant and Appellant County of Orange.

Law Offices of William D. Ross, William D. Ross and Carol B. Sherman for Defendants and Appellants California Quartet, Ltd., Aradi, Ltd., and Aradi, Inc.

Connor, Blake & Griffin, Edmond M. Connor and David J. Hesseltine for Plaintiff and Respondent Vedanta Society of Southern California.

Jensen & Coeur-Barron and VerLyn N. Jensen for Plaintiffs and Respondents Norbertine Fathers of Orange and Saddleback Meadows Land Conservancy.

Law Offices of Mary L. Hudson, Mary L. Hudson; Law Offices of Rachel J. Sater and Rachel J. Sater for Plaintiffs and Respondents Endangered Habitats League, Inc., Sea and Sage Audubon Society, Inc., and Rural Canyons Conservation Fund.

---

**OPINION**

**SILLS, P. J.—**

### I. INTRODUCTION

Tie votes mean different things in different contexts. The fictitious spelunkers in Lon Fuller's famous law review article, finding themselves trapped in a cave and resorting to cannibalism to stay alive for the requisite amount of time until a rescue party reached them, were sentenced to death for murder when the mythical five-person Supreme Court of Newgarth, reviewing the conviction of a lower court, tied two to two. The tie was the result of one justice on the five-person panel dithering to the point that he was unable to resolve his own doubts, and consequently withdrawing from the decision of the case. (See Fuller, *The Case of the Speluncean Explorers* (1949) 62 Harv. L.Rev. 616, 631, 645.) Fuller's spelunkers' case demonstrated the classic common law rule that a tie, in the context of an *appeal* from a lower court, leaves the decision being appealed from intact. His Justice Tatting in effect cast a vote to affirm by withdrawing from the case.[1]

It is not quite that way in the statutory thicket that is California's Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), CEQA for short. Appeals in American jurisprudence typically do not require the reviewing court to take evidence anew and *agree* on certain written findings. By contrast, appeals within the context of a local lead agency's decision-making process under CEQA do.

---

[1]Indeed, Chief Justice Rehnquist recently mentioned the spectre of an inadvertent affirmance of a lower court decision by a tie vote of the United States Supreme Court as a factor weighing against his recusal in a case where his son was a partner in a firm representing one of the litigants as local counsel in Boston. In a separate statement filed in *Microsoft Corporation v. United States* (2000) 530 U.S. 1301, 1303 [121 S.Ct. 25, 27, 147 L.Ed.2d 1048], he wrote that if he recused himself "[n]ot only is the Court deprived of the participation of one of its nine Members, but the even number of those remaining creates a risk of affirmance of a lower court decision by an equally divided court."

Appeals within a lead agency under CEQA are governed both by statute (Pub. Resources Code, § 21151) and regulations promulgated by the California Resources Agency. (See Cal. Code Regs., tit. 14, § 15000.)[2] When an unelected planning commission certifies an environmental impact report (or EIR), that certification may be appealed to the relevant agency's elected decisionmaking body, if it has one. (See Pub. Resources Code, § 21151, subd. (c).) In such a case, a regulation specifies that the "decision-making body to which an appeal has been made" *must* not only "consider" the EIR, but make certain written findings if appropriate (see Guideline 15185, subd. (b)) concerning the significant environmental effects associated with the project (see Guidelines 15091, subd. (a), 15093, subd. (b)). Such written findings are "appropriate" in any case where the EIR identifies significant environmental effects (Guideline 15091, subd. (a)) or where significant effects are identified but not "substantially lessened" (Guideline 15093, subd. (b)).

The need for consideration, written findings, and even a "brief explanation" (see Guideline 15091, subd. (a)) by the body to which the appeal is taken is simply incompatible with the approval by acquiescence. Consideration and written findings imply conscious, affirmative action, not default adoption of the status quo by inertness.

In the present case, the county planning commission certified an EIR for a 705-unit housing development in Trabuco Canyon. The EIR identified a variety of significant environmental impacts, including the change of night views from unlit dark open space to "urban night environment." A group of neighbors led by the Vedanta Society of Southern California appealed the certification to the Orange County Board of Supervisors. Supervisor Silva recused himself. The board held a hearing and then deadlocked two to two on Supervisor Steiner's motion to adopt the staff's recommendation to *deny* the appeal and *uphold* the certification. The board's own minute order described Steiner's *motion* as having "failed for lack of [a] majority." However, Supervisor Wilson then declared that the vote upheld the planning commission's decision and the project was processed on the assumption the EIR had been certified.

In response, the neighbors and certain environmental groups brought declaratory relief actions to establish that the various project approvals were based on an erroneous certification of the EIR. The actions were consolidated. In a successful summary adjudication motion (later followed by a

---

[2]All references to any "Guideline" or "Guidelines" are to title 14 of the California Code of Regulations. All references to "title 14" are to the California Code of Regulations.

motion for entry of judgment), the trial court agreed with the neighbors and the environmental groups, reasoning that the board, under the statute in the Government Code that governs actions by county boards of supervisors (Gov. Code, § 25005), had not acted on the neighbors' appeal. Since the board had taken no action in a context where affirmative action was required, the EIR had never been properly certified.

As one might gather from our comments concerning CEQA's consideration and finding requirements, the trial judge's decision was correct, though as we explain below, this result is dictated by CEQA and its controlling regulations alone. We do not reach any issue regarding the proper explication of Government Code section section 25005.

## II. FACTS

In 1993, California Quartet, Ltd., purchased some 222 acres of undeveloped land in Trabuco Canyon near St. Michael's Abbey and the Ramakrishna Monastery. In 1996, the firm proposed a 705-unit mobilehome development on the land, for which the County of Orange required an EIR. A draft EIR (EIR 566)[3] was circulated in June 1997.

In late November 1997, the Orange County Board of Supervisors adopted a special set of procedures just for the review of the circulating draft EIR. Those procedures provided that the planning commission would determine whether to certify the EIR in a meeting held December 3, 1997, and that any interested party could appeal a decision by the planning commission certifying the EIR within 15 days of the commission's decision. The appeal would be put on the agenda of a board of supervisors' meeting within 45 days of the receipt of the appeal. The board of supervisors would then "consider the appeal at a public meeting and make a determination whether to uphold the appeal in whole or in part or to deny the appeal." In the event of one of three contingencies—expiration of the appeal period without an appeal, "denial of any appeal and ratification of the Planning Commission's certification" or "certification" of the EIR "by the Board of Supervisors with modifications," it was provided that the "Building Official may issue the grading permit."

The Orange County Planning Commission certified the final EIR 566 in December 1997. The owners of the monastery, the Vedanta Society of

---

[3]Technically, a "subsequent" EIR was required because one had been prepared in the late 1970's. Hence the record and briefing typically refer to the EIR before us as "DS566" (for draft subsequent) or "FS566" (for final subsequent).

Southern California, timely appealed the planning commission's certification to the Orange County Board of Supervisors. The board held a public hearing in late February 1998 to consider the appeal.[4] At the end of the hearing Supervisor Steiner introduced a motion to deny the appeal and uphold the certification. Reminiscent of Peter Ustinov's equivocating British diplomat,[5] the vote was an opaque two to two, Supervisor Silva having recused himself. The board's minute order stated: "Motion to deny Appeal failed for lack of majority." However, Supervisor Wilson, acting as vice chairman of the board, declared that the tie vote meant the planning commission's action had been upheld. The next month the Vedanta Society filed a lawsuit (Orange County Superior Court, No. 791309), seeking a declaration that the board had not made any determination of the society's appeal, and specifically did not ratify or uphold the planning commission's action.

Meanwhile, California Quartet submitted tentative tract maps for approval of a 299-unit project involving single-family homes instead of mobile-homes. In December 1998, the board of supervisors, this time by a vote of three to one (Supervisor Silva still abstaining), adopted a resolution declaring that the 299-unit project did not "trigger the preparation of a subsequent EIR" and that a mere addendum to the already certified EIR would suffice. Two more lawsuits followed in January 1999: The first was an ecumenical effort, in which the Norbertine Fathers of Orange who own St. Michael's Abbey joined with the Vedanta Society of the Ramakrishna Temple and the Saddleback Meadows Land Conservancy (Orange County Superior Court, No. 804137).[6] The second (Orange County Superior Court, No. 804139) was brought by three environmental organizations: the Endangered Habitats League, Inc., the Sea and Sage Audubon Society, Inc., and the Rural Canyons Conservation Fund. The three lawsuits were consolidated in April 1999; by August, the plaintiffs in the consolidated action brought a summary adjudication motion to establish that EIR 566 was legally inadequate under CEQA. The trial court granted the summary adjudication motion in November, reasoning that the tie vote in February 1998 was " 'no action' by the

[4]We grant California Quartet's request that this court take judicial notice of a series of documents from the County of Orange Planning and Development Services Department, showing that the public was given due notice of the board's consideration of Vedanta's appeal.

[5]A character known for saying "his majesty's government does not say yea, nor does it say nay, and this in no way should be construed as an abstention."

[6]The complaint in case No. 804137 is not your typical dry-as-sand complaint. It begins by comparing the plaintiffs to voices " 'crying in the wilderness,' " and explicitly refers to the book of Isaiah, the source of the phrase. (See Isaiah 40:3.) Of course, given that the "voice in the wilderness" reference was later used to refer to someone who, as the modern saying goes, had his head handed him on a plate.(see Matthew 3:3), it could hardly have been considered "prophetic" of the results of the litigation, at least at the trial and, given our decision today, the intermediate appellate level. Because this is a land use case, perhaps a better allusion to the book of Isaiah would have been from chapter 5, verse 8: "Woe unto them that join house to house, that lay field to field . . . ." (For they shall be forced to comply with CEQA.)

board with respect to [Vedanta's] appeal because Government Code section 25005 required a three-member majority vote by the Board in order for the Board to take affirmative action thereon to either deny the Appeal or uphold it."

On January 3, the county filed a writ petition challenging the summary adjudication (No. G026580). However, two days later Vedanta filed a motion for entry of judgment based on its victory in the summary adjudication. The trial court granted the motion for entry of judgment on February 23, 2000.[7] The judgment provided a declaration that EIR 566 was never validly certified; the judgment also provided for a peremptory writ of mandate directing the county to vacate and set aside all approvals with regard to the 299-unit project. This court ordered that the county's writ be treated as an appeal from the judgment, and has included California Quartet's formal appeal within the one docket number, G026580.[8]

## III. DISCUSSION

### A. *Under CEQA and Its Regulations, an Appeal from the Certification of an EIR by an Unelected Planning Commission Must Be Decided by the Majority Vote of the Elected Body*

■ This case centers on Public Resources Code section 21151, subdivision (c).[9] Subdivision (c) sets forth the language governing appeals from EIR certifications made by "a local lead agency's decisionmaking body which is not elected," such as the planning commission in the case before us. The language, in its entirety, is: "When an environmental impact report is certified by a local lead agency's decisionmaking body which is not elected, that certification may be appealed to the agency's elected decisionmaking body, if any."

We may first dispense with any idea that the permissive "may" in the text, or the hint contained in the words "if any" at the tag end of the statute, somehow allow for a situation where a county board of supervisors might have the discretion *not* to provide for appeals from a planning commission

---

[7]Appellants raise no issue in this appeal that the summary adjudication motion was not effectively dispositive of the litigation.

[8]Because *Vedanta* prevailed, the fact that it dismissed certain claims in its complaint without prejudice does not make the judgment any less appealable. *Don Jose's Restaurant, Inc. v. Truck Ins. Exchange* (1997) 53 Cal.App.4th 115 [61 Cal.Rptr.2d 370] and its progeny have no application where the party dismissing causes of action without prejudice is the *respondent* on appeal.

[9]All references in this opinion to "section 21151" are to the Public Resources Code. All references to "subdivision (c)" or to "subdivision (a)" are to section 21151.

certification. Whatever ambiguity might be teased out of the text of section 21151 cannot withstand the plain force of state regulations, specifically Guideline 15090, subdivision (b). Guideline 15090, subdivision (b) unequivocally leaves no room for local agencies to omit an appeals process: "When an EIR is certified by a non-elected decision-making body *within* a local lead agency, that certification may be appealed to the local lead agency's elected decision-making body, if one exists. For example, certification of an EIR for a tentative subdivision map by a city's planning commission may be appealed to the city council. *Each local lead agency shall provide for such appeals.*" (Italics added.)

*Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770 [128 Cal.Rptr. 781] (*Kleist*) makes it clear that Guideline 15090, subdivision (b), which requires local governments to have an appeals procedure, is not only *not* beyond the purview of the enabling statutes (see Pub. Resources Code, §§ 21082.1, 21100 [general statutory authority for regulations implementing CEQA]), but wholly consistent with the statutory scheme of CEQA as a whole. In *Kleist*, one of the issues was whether the Glendale City Council could delegate review and consideration of an EIR to a special board created by city ordinance. In holding that the city council *itself* was required to review and consider the EIR, the court reasoned that "[d]elegation is inconsistent with the purpose of the review and consideration function since it insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values. Delegation is inconsistent with the purposes of the EIR itself." (*Kleist, supra*, 56 Cal.App.3d at p. 779.) Applied to the present case, it follows from the *Kleist* antidelegation rule that the ultimate responsibility for approving an EIR in the case before us was in the elected board of supervisors, not the unelected planning commission. (See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352] ["By necessary inference, the board of supervisors cannot delegate the responsibility" for considering an EIR "to the staff of the planning commission"].)

Now, we are not saying (and *Kleist* should not be read to say) that an elected body cannot explicitly *adopt* findings made by a nonelected body. In *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391 [200 Cal.Rptr. 237], decided by the same court that decided *Kleist* (see *Greenebaum, supra*, 153 Cal.App.3d at p. 403), the Court of Appeal held that an adoption of the findings of a planning department's deputy advisory agency by a city council was not an improper delegation. (See *id.* at pp.

398-399, 402-403.)[10] But it is also clear, from Guideline 15090, subdivision (b), that the elected decision makers must have a real confrontation with the EIR; they cannot avoid the required "consideration" by omitting a procedure for appeal.

Moreover, confrontation with the certification of an EIR by a nonelected body is consonant with the *Kleist* court's observation that the whole purpose of the EIR "review and consideration function" is—to put that court's rationale in less genteel terms—to expose the elected decision makers to the political heat of certifying an EIR. Accordingly, another regulation, Guideline 15185, subdivision (b), builds on the requirement of an appellate process in Guideline 15090, subdivision (b) by explicitly obligating the elected decision makers to "consider" a certified EIR *and* "make findings" about it.[11]

The current text of Guideline 15185, subdivision (b) is: "The decision-making body to which an appeal has been made shall consider the environmental document and make findings under Sections 15091 and 15093 if appropriate." The words "if appropriate" certainly indicate, of course, that there may be times when "findings" are *not* appropriate. There is no need in this case, however, to limn those instances when findings might not be

---

[10]*Greenebaum* involved a 24-unit condominium project in Los Angeles which made its way from an environmental review committee to a deputy advisory agency to the city planning commission to the city council. Along the way, the planning commission voted two to two, which, according to the opinion, "left intact the action of the deputy advisory agency." (*Greenebaum v. City of Los Angeles, supra*, 153 Cal.App.3d at p. 398.) Nobody raised an issue in *Greenebaum* regarding the tie vote, however, so the opinion is legally silent on the point.

[11]In Guideline 15185, subdivision (a), the syntax in the first sentence suggests a faint whiff of a glimmer of an idea that the elected decision makers might not be obligated to provide for appeals: "Where an agency allows administrative appeals upon the adequacy of an environmental document, an appeal shall be handled according to the procedures of that agency." The "where an agency allows" language might be read to imply that there are instances "where" an agency *doesn't* allow such appeals. However, the language should not be read that way. A basic canon of linguistic construction is that two parts of the same basic document or scheme (such as a set of regulations) should be read as a whole to reconcile apparent inconsistencies. (Cf. Civ. Code, § 1652; see also *Bingham v. CTS Corp.* (1991) 231 Cal.App.3d 56, 68 [282 Cal.Rptr. 161] [reading regulations "as a whole"].) The theory behind the rule is pretty simple: Authors, whether they be poets, novelists, or on the staff of the office of planning and research (see Guideline 15000) generally do not want to contradict themselves—and when they do, their whimsy should be relatively obvious from the text (e.g., "The sun was shining on the sea/Shining with all his might . . . And this was odd, because it was/The middle of the night"). Texts thus generally should be read with the presumption of reconciling apparent inconsistencies. Guideline 15090, subdivision (b) unambiguously requires an appellate process, as does the common law construing the basic review and consideration function in CEQA (see *Kleist, supra*, 56 Cal.App.3d at p. 779), so the ambiguous "where" in Guideline 15185, subdivision (a) simply refers to those times when a party chooses to exercise its right of appeal, not the option given the agency to have them in the first place.

"appropriate," because in the present case they clearly were. Appropriateness under Guideline 15185, subdivision (b) is clearly tethered to the standards set out in Guidelines 15091 and 15093. "Under" Guideline 15091, no public agency may approve a project where an EIR has identified at least one significant environmental effect "unless the public agency makes one or more written findings for each of those significant effects, *accompanied by a brief explanation of the rationale for each finding*." (Italics added.) Likewise, Guideline 15093, subdivision (b) requires a public agency to "state in writing the specific reasons to support its action based on the final EIR and/or other information in the record" whenever the decision allows "the occurrence of significant effects which are identified in the final EIR but are not avoided or substantially lessened."

At its absolute narrowest, the "if appropriate" language in Guideline 15185, subdivision (b) requires an affirmative "explanation" in any case where an EIR identifies at least one significant environmental effect, which, of course, is the case before us. The final EIR in the present case identified a number of significant environmental impacts, including adverse air quality, loss of 50.3 acres of coastal sage scrub, loss of 14.6 acres of Coast Live Oak Woodland, conflict with existing wildlife movement corridors, permanent viewshed alteration and even the night lighting glare to which we have already referred. In sum, given an EIR here, the Orange County Board of Supervisors was under an affirmative duty to "make findings" pursuant to Guidelines 15091 and 15093.

Now we come to the nub of the case. California Quartet and the board do not argue, on appeal, that the board was relieved of the need to make findings in regard to Vedanta's appeal from the planning commission's certification, but rather that it is "ludicrous" to require the board to render findings "separate and apart" from the commission's detailed findings. Their theory is that by deadlocking, the *default* result was an adoption of the planning commission's "detailed" findings and explanations.

We do not disagree with the idea that an elected body can adopt the findings and explanations of the lower body.[12] As mentioned above, there is no reason an elected body cannot adopt the detailed findings and explanations made by the lower unelected body from which the Guideline 15185

---

[12]There is a judicial analog here: In the past our Supreme Court has, on occasion, simply repeated the opinion, or parts of the opinion, of the Court of Appeal in rendering its decision. (E.g., *Deas v. Knapp* (1981) 29 Cal.3d 69, 74 [171 Cal.Rptr. 823, 623 P.2d 775]; *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 410 [134 Cal.Rptr. 402, 556 P.2d 764].) That didn't mean, however, that the high court was any less engaged in confronting the case (in *Deas*, for example, there was a separate concurring and dissenting opinion); it simply chose not to redo the work of the lower court.

administrative appeal is taken. (See *Greenebaum v. City of Los Angeles, supra*, 153 Cal.App.3d 391, 402-403.)

But just because the board could have adopted findings of the planning commission here does not mean that a tie vote has the effect of adopting findings. What the board and California Quartet fail to appreciate is this: The very fact that "findings" (including a Guideline 15091, subd. (a) *explanation*) must be made *at all* is incompatible with the nature of a tie vote. A tie vote can certainly result, as it did with Fuller's spelunkers, in an acquiescence. But it cannot constitute an affirmative act de novo. If a board must "provide a brief explanation" of the "rationale" of any findings regarding "significant environmental effects" identified in the EIR (Guideline 15091, subd. (a)), or "state in writing the specific reasons to support its action" when there are significant effects not substantially mitigated (Guideline 15093, subd. (b)), it is by necessity forced to act in a conscious, aware, deliberative manner. In effect, CEQA requires not only de novo *review* by a board of supervisors, but de novo fact finding as well.

Elected decision makers faced with appeals under CEQA from unelected bodies thus do not have the luxury of playing Hamlet. Findings and adoptions of findings are by nature affirmative acts. They are, in essence, literary acts by authors, even if those authors only recapitulate earlier work. Inherent in a consideration and finding requirement is that the body of elected decision makers must take unambiguous action, and unambiguous action means decision makers cannot be evenly divided against themselves. In CEQA terms, they have no alternative to taking arms against the troubles identified in the EIR; they do not have the option of suffering them silently.

The affirmative nature of the confrontation with the EIR required under CEQA is illustrated by *City of Carmel-by-the-Sea v. Board of Supervisors* (1977) 71 Cal.App.3d 84 [139 Cal.Rptr. 214], which dealt with whether a zoning administrator had properly considered "all issues raised in the EIR before making his decision regarding the issuance of use permits." (*Id.* at p. 95.)[13] The zoning administrator ducked consideration of air pollution, and water or traffic considerations, saying that such matters were legislative decisions for the board of supervisors. The Court of Appeal ultimately rejected that position, noting that the administrator's refusal to consider the

---

[13]In *City of Carmel-by-the-Sea* there was no issue of whether there was any improper delegation to the zoning administrator; the plaintiffs, in fact, appeared to have accepted the administrator's role as having "the prime decision-making authority on environmental matters." (*City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 71 Cal.App.3d at p. 95.) We therefore preceive no tension between *Kleist* (city council could not delegate EIR review to special board) and *City of Carmel-by-the-Sea*.

air, water and traffic aspects of the project meant he had "abdicated the responsibility to make decisions on environmental matters . . . ." (*City of Carmel-by-the-Sea*, at p. 96.) The appellate court looked for evidence of some real confrontation by the administrator with the economic and social values in the project, and, finding none, concluded his findings were insufficient to support his decision. (*Ibid.*)

## B. *Disposition of the Board's and California Quartet's Various Arguments*

### 1. *The County Did Not Provide (and Could Not Have Provided) for Certification of the EIR by Tie Vote*

■ The appellants' core argument is a gloss on Guideline 15185, subdivision (a), which provides that "Where an agency allows administrative appeals upon the adequacy of an environmental document, an appeal shall be handled according to the procedures of that agency." They argue that here the board indeed adopted internal procedures allowing for the certification of an EIR (and presumably, for the adoption of findings by the planning commission) by a tie vote.

This argument, however, fails both generally and specifically. The general reason it fails is that tie votes are incompatible with the kind of affirmative action implied in Guidelines 15185, subdivision (b), 15091, subdivision (a), and 15093, subdivision (b). As we have said, a board cannot validly provide for an approval of an EIR by tie vote. In doing so, it would be circumventing the protections provided by CEQA to expose elected decisionmakers to the political consequences of any decision to certify an EIR. There is a sort of grand design in CEQA: Projects which significantly affect the environment *can* go forward, but only after the elected decision makers have their noses rubbed in those environmental effects, and vote to go forward anyway.

The argument also fails specifically, because in point of fact the board did *not* adopt procedures allowing for certification of EIR's and adoption of planning commission findings regarding EIR's by tie vote.[14] First, there is nothing in the set of special procedures adopted in November 1997 by the county in anticipation of Vedanta's particular appeal that allows for approval by tie vote. Those procedures, if anything, *excluded* the possibility of an

---

[14]Which actually is to be expected. The very act of explicitly writing down such a procedure would focus the county counsel doing the drafting on the various findings and explanation requirements set forth in the regulations, illustrating the fundamental incompatibility of tie votes and affirmative findings.

approval by tie vote because they required the board to "consider the appeal at a public meeting and *make a determination whether* to uphold the appeal in whole or in part or to deny the appeal." (Italics added.) Making a "determination" implies affirmative action, disconsonant with passively not disturbing the work of a subordinate body. Moreover, the adopted procedures specifically identified three contingencies—expiration of the appeal period without an appeal, "denial of any appeal and ratification of the Planning Commission's certification" or "certification" of the EIR "by the Board of Supervisors with modifications," which would mean that the "Building Official may issue the grading permit." The negative implication of the identification of the three contingencies (*expressio unius est exclusio alterius*) is that an unidentified contingency would result in the building official's *not* being able to issue any grading permit.

The same applies to a county ordinance, section 7-9-157 of the Codified Ordinances of the County of Orange (County Code), on which the board and California Quartet heavily rely. County Code section 7-9-157 provides that if an action on a discretionary permit, zone change, or zoning code amendment results in a tie vote by the decisionmaking body, that tie vote "shall constitute disapproval" of the permit, permit appeal, proposed permit revocation, proposed zone change, or proposed zoning code amendment.[15] As the trial court noted, the ordinance does not address EIR's, which, as we have shown, are tightly controlled by CEQA and CEQA regulations in imposing affirmative requirements of written findings.

To the same effect are the County of Orange Environmental Analysis Procedures, adopted in June 1985, which again, if anything, militate against approval by deadlock. Under the heading "EIR Approval and Certification," the county's environmental procedures state: "Where the Planning Commission is not the decision making body, it shall render its opinion in writing (and such may be indicated in its minutes) and such opinion *shall be considered by, but not binding upon, the decision making body*." (Italics added.) The directive to affirmatively "consider," without any indication that the lower body's action is "binding," would in ordinary circumstances lead to the conclusion that affirmative action on the part of the board was

---

[15]Here is the exact text of County Code section 7-9-157: "If action on a discretionary permit per section 7-9-150 or a zone change or Zoning Code amendment per section 7-9-103, 7-9-155, or 7-9-156 results in a tie vote by the decision-making body, that shall constitute disapproval of the (1) proposed permit, (2) permit appeal (i.e., original action stands), (3) proposed permit revocation [(]permit remains valid), (4) proposed zone change (including amendments to specific plans and planned communities), or (5) proposed Zoning Code amendment, as applicable."

necessary; inaction would not de facto ratify the decision of the planning commission.

Finally, there is the "policy" or custom of the board, spelled out in a declaration of a supervising deputy county counsel submitted in opposition to the summary adjudication motion. That declaration avers "it is the policy of the County that, in the case of a tie-vote on an appeal of a discretionary permit approval or other discretionary action such as an EIR certification, that the appeal is not upheld and the lower administrative body's decision stands." In line with this alleged "policy," the same deputy county counsel, prior to the public hearing portion of the February meeting that resulted in the two-to-two tie, was asked by Supervisor Spitzer "what would happen if there were not three votes to uphold the appeal? Then what would happen by default?" His answer: "The decision of the Planning Commission would remain in effect."

The declaration was irrelevant to the summary adjudication motion.[16] Going back to the general point, the Guidelines requirements for affirmative action necessarily trump any local custom which would have the effect of obviating those requirements. Additionally, the "procedures" language in Guideline 15185, subdivision (a) necessarily contemplates *written* procedures which can be ascertained beforehand, not some unwritten local custom or "policy," which, by definition, would be at best only haphazardly discovered.

### 2. *The Exhaustion of Remedies Doctrine Is No Bar to This Lawsuit*

The county did not have any written procedures providing for approval of EIR's by tie votes of the board, and *it could not have had any and been in compliance with the CEQA Guidelines*. At most it had an unwritten custom which the board had to be reminded of before the February vote. Given these facts, it is obvious that the board's and California Quartet's claim that the plaintiffs did not exhaust their administrative remedies with regard to the effect of the February vote is meaningless. It was not Vedanta that was in need of a remedy in the wake of the failure of certification that was the result of the two-to-two tie vote.

---

[16]The trial court struck the declaration, which the appellants claim was error. While the trial court didn't need to go so far as to strike the declaration, it was all much of a muchness in terms of its effect on the result. In the language of summary adjudication, the deputy county counsel's declaration simply failed to raise any material issue of fact, and therefore made no difference to the moving parties' entitlement to the adjudication.

### 3. *The Addendum Did Not Cure the Fact That the Original EIR Was Never Validly Certified*

The board voted three to one in December 1998 to adopt a resolution declaring that the 299-unit project did *not* "trigger the preparation of a subsequent EIR" and that a mere addendum would suffice for the already certified EIR. The appellants contend that the three-to-one affirmative December vote made the earlier February two-to-two tie moot, but the three-to-one vote could not render Vedanta's challenge moot because the resolution offered by Supervisor Spitzer was not a straight vote on the EIR or the project. It was a vote on whether an "addendum" to an EIR which (as the resolution makes clear) the board believed had *already* been certified, was required under CEQA, or whether something more was necessary, such as a "subsequent" EIR.[17] Specifically, the board found that "per Section 15164 of the CEQA Guidelines, the proposed Contingency Plan meets all the criteria which would allow the preparation of an Addendum to Certifed [*sic*] FSEIR 566."

Under Guideline 15164, an addendum may be prepared to a *"previously certified EIR* if some changes or additions are necessary but none of the conditions described in Guideline 15162 calling for preparation of a subsequent EIR have occurred." (Italics added.) As we have explained above, this EIR was never validly certified. A vote to allow an addendum made on the assumption that it already was certified cannot substitute for a vote certifying the EIR in the first place. We need only point out in that regard that if such a procedure were valid under CEQA, it would allow decisionmaking bodies to circumvent the political scrutiny built into the CEQA process, because one decision maker could use an abstention as a de facto "yes" vote, and then later hide behind a subsequent overt "yes," vote on the theory that the second vote only involved a technical or housekeeping matter on a project that was already inevitable. ("Who? Me take responsibility for approving this project?")

The failure-to-exhaust-administrative-remedies argument with regard to the *addendum* leveled against Vedanta and the other plaintiffs is simply erroneous. A letter from the plaintiffs' attorney sent to the Orange County Planning and Development Services Department dated August 25, 1998,

---

[17]Indeed, a public notice regarding the proposed subdivision of the property into 299 lots for single-family residential development put out by the subdivision committee of the planning commission in October 1998 stated that "the project [was] within the scope of previously finalized EIR 566."

gave fair notice of the problem of the adequacy of the certification of the EIR,[18] even assuming the lawsuit filed the previous March was not sufficient.[19]

### 4. *Declaratory Relief Was Available*

■ California Quartet asserts that the trial court could not have granted Vedanta declaratory relief because administrative mandamus (see Code Civ. Proc., § 1094.5) was its exclusive remedy. Not so. There is nothing incompatible between administrative mandamus and declaratory relief. (E.g., *J. L. Thomas, Inc. v. County of Los Angeles* (1991) 232 Cal.App.3d 916, 924 [283 Cal.Rptr. 815] [person has standing to challenge facial validity of statute in declaratory relief without exhausting administrative remedies]; *Subriar v. City of Bakersfield* (1976) 59 Cal.App.3d 175, 195 [130 Cal.Rptr. 853] [constitutional questions could be reached by action for declaratory relief independent of administrative mandamus].) More to the point, though, Vedanta's declaratory relief claims did not challenge any specific adjudicatory or "quasi-judicial" act of the board. It simply sought resolution of the controversy over the *legal effect* of the tie vote. Declaratory relief has been used without comment to ascertain the effect of tie votes in non-CEQA contexts (*Dry Creek Valley Assn., Inc. v. Board of Supervisors* (1977) 67 Cal.App.3d 839 [135 Cal.Rptr. 726]), and declaratory relief is tailor-made for a case such as this one, centered as it is on a pure question of law—whether the board even made a decision—*not* a question of whether an administrative record contained substantial evidence to support a decision that the agency unquestionably did make.

### IV. CONCLUSION

In affirming the judgment, we rule on a narrower basis than the trial court, which held that the tie vote was not an "act" within the meaning of Government Code section 25005 ("No act of the Board shall be valid or binding unless a majority of all the members concur therein"). That is, we do not reach the question as to whether a tie vote by an elected local body (such as a city council or a county board of supervisors) in *non*-CEQA cases

---

[18] A list of 16 objections to the addendum was attached to the letter, No. 14 of which was that the county had "violated CEQA and the CEQA Guidelines in that it has improperly relied upon FSEIR 566, which is a legally inadequate CEQA document that was improperly certified for the reasons set forth in that certain 'Complaint for Declaratory Relief and Petition for Writ of Mandate,' which is attached hereto as Exhibit 'C' and is incorporated herein by reference . . . ."

[19] We are therefore spared the need for a disquisition on the futility exception to the exhaustion doctrine.

might have the effect of affirming the decision of a nonelected local body, such as a planning commission. CEQA and its regulations are sufficient to uphold the trial court's decision here.

We also emphasize the narrowness of our decision in terms of the issues that we do not address. Our decision only goes to whether the board validly certified the EIR, not what the consequence of the failure to do so is. The parties have not argued the question of where the case goes from here, and, in particular, what happens when a lead agency fails to certify an EIR within applicable time frames, which at the outside are not to exceed one year. (See Pub. Resources Code, § 21151.5, subd. (a)(1)(A).) We simply note that a developer is not without a remedy for a lead agency's failure to certify an EIR because it deadlocked on the vote. The recent case of *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215 [86 Cal.Rptr.2d 209] makes it clear that a petition for writ of mandate and a complaint for damages under 42 United States Code section 1983 are available for an agency's refusal to act in failing to complete and certify an EIR. (See *Sunset, supra*, 73 Cal.App.4th at pp. 221 [mandamus available for refusal of city to complete EIR] and 225 [damages for violation of federal civil rights available because agency may not arbitrarily refuse to complete an "adequate" EIR].)

The political-heat rationale thus cuts both ways: A vote to *refuse* to certify an EIR, or an absention (which, as we have seen, is the same) is not exactly a "cheap" no vote. A detailed exploration of the board's inaction, however, can await another day. Respondents shall recover their costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.